El Juez Asociado Señor Rebollo López
emitió la opinión del Tribunal.
El 5 de septiembre de 2000, el Sr. Víctor S. Maldonado, por conducto del Ing. Manuel A. Novas, presentó ante la Junta de Planificación (Junta) una consulta de ubicación para el desarrollo de un parque industrial pesado de aproximadamente cuarenta y cinco cuerdas en el barrio Coito Norte del municipio de Manatíasí como la posible enmienda al Mapa de Zonificación Especial de la Cuenca Hidrográfica de la Laguna Tortuguero.(1) El terreno donde ubicaría el proyecto propuesto está clasificado como un Distrito LT-Al (Laguna Tortuguero-Agrícola Mecanizable) y LT-B1 (Laguna Tortuguero-Bosques Interiores).
El proyecto propuesto fue sometido ante la consideración de diversas agencias gubernamentales, entre las que se encontraban la Autoridad de Energía Eléctrica (AEE), la Autoridad de Acueductos y Alcantarillados (AAA), la Autoridad de Carreteras y Transportación (ACT), la Compañía de Fomento Industrial (CFI), el Instituto de Cultura Puertorriqueña (ICP), el Departamento de Recursos Naturales y Ambientales (DRNA), el Departamento de Agricultura (DA) y municipio de Manatí.
Luego de evaluar el proyecto solicitado, tanto la AEE como la CFI y el DA indicaron que no tenían objeción a que la Junta aprobara el proyecto. Por su parte, la AAA y la ACT condicionaron su recomendación favorable a que se realizaran diferentes mejoras a la infraestructura del lugar, mientras que el ICP y el DRNA solicitaron una evaluación arqueológica y un documento ambiental para poder emitir su opinión. Por último, el municipio de Manatí endosó favorablemente el proyecto por entender que “era de *52 suma importancia para el desarrollo económico del Municipio de Manatí”.
El 25 de octubre de 2000, la Junta solicitó del señor Maldonado que sometiera varios documentos, entre los que se encontraba una evaluación ambiental para celebrar una vista pública. Así las cosas, el 13 de febrero de 2001 se celebró la mencionada vista, recibiéndose en ella la oposición —mediante ponencia oral y escrita— de parte del Instituto Ambiental COTICAM de Puerto Rico (COTICAM).(2)
Luego de varios trámites, entre los que se encuentra la réplica del ingeniero Novas a la oposición de COTICAM, la Junta volvió a evaluar la consulta solicitada y le concedió un término a las partes para que emitieran sus comentarios. Posteriormente, la oficial examinadora emitió su recomendación y la Junta decidió archivar sin perjuicio la consulta por treinta días hasta que la parte solicitante sometiera los documentos solicitados.
Mientras todo lo anterior ocurría, el 28 de octubre de 2000 entró en vigor el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero el cual tiene entre sus objetivos establecer la política pública que guiará el uso de los terrenos del área.
Así las cosas, y luego que el solicitante cumplió con la solicitud de la Junta antes mencionada —sobre producción de documentos el 17 de enero de 2002, y notificada el 25 de febrero del mismo año— la Junta emitió una resolución mediante la que denegó la consulta de ubicación. En síntesis, la referida agencia resolvió que el proyecto propuesto no cumplía con el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 e iba contra la Ley Núm. 292 de 21 de *53 agosto de 1999, conocida como la Ley para la Protección y Conservación de la Fisiografía Cárstica de Puerto Rico, 12 L.P.R.A. see. 1151 et seq., y con otras políticas públicas establecidas.
Oportunamente, Maldonado presentó una solicitud de reconsideración ante la Junta, la cual fue acogida el 2 de abril del mismo año. Transcurridos noventa días desde que la Junta acogió la moción de reconsideración sin que ésta se expresara ni concediera prórroga alguna, Maldonado acudió —mediante un recurso de revisión administrativa— ante el Tribunal de Apelaciones. Adujo, en síntesis, que la Junta erró al utilizar el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 para denegar la consulta de ubicación solicitada y al determinar que el proyecto propuesto atenta contra el documento Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico.
Tras analizar los argumentos de ambas partes, el foro apelativo intermedio revocó la resolución recurrida y devolvió el caso para que la Junta, entre otras cosas, evaluara la consulta de ubicación propuesta según el Reglamento de Zonificación Especial para la Cuenca Hidrográfica de la Laguna Tortuguero, vigente a la fecha de su presentación. Además ordenó que, al evaluar la solicitud, se consideraran los objetivos 5.02, 5.03, 5.04, 5.05 y 5.06 del documento Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico y que se remitiera a la Junta de Calidad Ambiental la evaluación ambiental que preparó el solicitante.
Insatisfecha, la Junta de Planificación acudió —mediante un recurso de certiorari— ante este Tribunal. Alega que procede revocar la sentencia emitida por el foro apelativo intermedio debido a que dicho foro incidió
... al entender en el recurso de revisión instado cuando no tenía jurisdicción para ello.
*54 .. al determinar que el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna de Tortuguero, de 28 de octubre de 2000, no era de aplicación a la consulta de ubicación de auto[s].
... al determinar que la Junta de Planificación, indistintamente de si ya tenía criterios suficientes para denegar la consulta, debía someter la [Evaluación Ambiental] a la consulta de la Junta de Calidad Ambiental.
... al determinar que la Junta de Planificación debía analizar otras disposiciones del documento de Objetivos y Políticas Públicas [del] Plan de Terrenos a pesar de señalar que la Junta de Planificación había fundamentado su determinación en este aspecto. Petición de certiorari, págs. 4-5.
Expedimos el recurso solicitado. Contando con la posición de ambas partes y estando en posición de resolverlo, procedemos a así hacerlo.
I
Evaluamos, en primer término, el primer señalamiento de error en el cual se sostiene que el Tribunal de Apelaciones carecía de jurisdicción para entender en el recurso.
La Junta aduce que el foro apelativo intermedio carecía de jurisdicción para atender el recurso ante su consideración porque éste alegadamente se presentó tardíamente. En apoyo a su contención, alega que el recurrido presentó el recurso ante el Tribunal de Apelaciones transcurridos los treinta días siguientes a los noventa días posteriores a la oportuna presentación de la moción de reconsideración que la Junta acogió, ello en contravención con la Sec. 3.15 de la Ley Núm. 170 de 12 de agosto de 1988, mejor conocida como la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (L.P.A.U.), 3 L.P.R.A. sec. 2165. No tiene razón.
Como es conocido, las cuestiones de jurisdicción son de carácter privilegiado, por lo que un planteamiento de esa índole se puede presentar tanto ante el Tribunal de Primera Instancia como en la fase apelativa del caso. J.P. *55 v. Frente Unido I, 165 D.P.R. 445 (2005); Morán v. Martí, 165 D.P.R. 356 (2005). En otras palabras, los tribunales deben ser fieles guardianes de su jurisdicción, independientemente de que el asunto haya sido planteado anteriormente o no. Id.
La jurisdicción no se presume ya que, previo a la consideración en los méritos de un recurso o una vez cuestionada su jurisdicción, es deber ministerial de todo tribunal evaluar si la posee, pues ello incide directamente sobre el poder mismo para adjudicar una controversia. Carattini v. Collazo Syst. Analysis, Inc., 158 D.P.R. 345 (2003); Soc. de Gananciales v. A.F.F., 108 D.P.R. 644 (1979). La ausencia de jurisdicción no es susceptible de ser subsanada y las partes no pueden voluntariamente otorgarle jurisdicción sobre la materia a un tribunal ni éste puede adjudicársela. Vázquez v. A.R.Pe., 128 D.P.R. 513 (1991).
Los tribunales no tienen discreción para asumir jurisdicción donde no la hay. Por ello, cuando un tribunal dicta una sentencia sin tener jurisdicción sobre las partes o la materia, su decreto es jurídicamente inexistente o ultra vires. Empress Hotel, Inc. v. Acosta, 150 D.P.R. 208 (2000).
En cuanto al término para acudir ante el Tribunal de Apelaciones para solicitar la revisión de una resolución emitida por una agencia administrativa, la Sec. 3.15 de la L.P.A.U., ante, dispone:
La parte adversamente afectada por una resolución u orden parcial o final podrá, dentro del término de veinte (20) días desde la fecha de archivo en autos de la notificación de la resolución u orden, presentar una moción de reconsideración de la resolución u orden. La agencia dentro de los quince (15) días de haberse presentado dicha moción deberá considerarla. Si la rechazare de plano o no actuare dentro de los quince (15) días, el término para solicitar revisión comenzará a correr nuevamente desde que se notifique dicha denegatoria o desde que expiren esos quince (15) días, según sea el caso. Si se tomare alguna determinación en su consideración, el término para solicitar revisión empezará a contarse desde la fecha en *56 que se archive en autos una copia de la notificación de la resolución de la agencia resolviendo definitivamente la moción de reconsideración. Tal resolución deberá ser emitida y archivada en autos dentro de los noventa (90) días siguientes a la radicación de la moción de reconsideración. Si la agencia acoge la moción de reconsideración pero deja de tomar alguna acción con relación a la moción dentro de los noventa (90) días de ésta haber sido radicada, perderá jurisdicción sobre la misma y el término para solicitar la revisión judicial empezará a contarse a partir de la expiración de dicho término de noventa (90) días salvo que la agencia, por justa causa y dentro de esos noventa (90) días, prorrogue el término para resolver por un período que no excederá de treinta (30) días adicionales. (Enfasis suplido.)
Debemos destacar, a su vez, que el Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031 de 13 de octubre de 1999 (Reglamento de Procedimientos Adjudicativos de la Junta), contiene una disposición prácticamente idéntica a la antes transcrita Sec. 3.15 de la L.P.A.U.(3)
Como podemos notar, ambas disposiciones establecen, en síntesis, que una vez la Junta —o una agencia administrativa— acoge una oportuna moción de reconsideración, ésta tiene noventa días, contados a partir de la presenta *57 ción de la referida moción, para resolverla. De lo contrario, la Junta perderá jurisdicción sobre el caso y el término de treinta días para acudir al Tribunal de Apelaciones para solicitar la revisión del dictamen comenzará a contar una vez venzan los noventa días antes mencionados. En otras palabras, el término para acudir en alzada vencerá transcurridos los ciento veinte días de la presentación de la moción de reconsideración, acogida y no resuelta por la Junta.(4)
En el caso ante nuestra consideración, la moción de reconsideración se presentó el 18 de marzo de 2002 y la Junta la acogió el 2 de abril de 2002. No obstante haberla acogido oportunamente, la Junta dejó transcurrir noventa días desde la fecha en que se presentó la moción de reconsideración sin emitir dictamen alguno. El 31 de julio de 2002 —135 días después de presentada la moción de reconsideración— Maldonado instó un recurso de revisión administrativa ante el Tribunal de Apelaciones. De lo anterior se deduce que el recurso antes mencionado —a priori— fue tardío por haberse presentado transcurridos los ciento veinte días de la presentación de la moción de reconsideración.

Ahora bien, nuestro análisis no termina aquí; ello porque el recurrido Maldonado alega que las advertencias incluidas en la notificación de la resolución aquí recurrida fueron defectuosas.

Como se sabe, la Sec. 3.14 de la L.P.A.U. establece que toda orden o resolución emitida por una agencia advertirá el derecho de solicitar su reconsideración o revisión con la expresión de los hechos correspondientes, y que cumplido este requisito comenzarán a regir dichos términos. 3 L.P.R.A. see. 2164. Cónsono con dicho precepto, hemos resuelto que el derecho a una notificación adecuada *58 es parte del debido proceso de ley y que, por ello, la notificación defectuosa de una resolución no activa los términos para utilizar los mecanismos postsentencia, quedando éstos sujetos a la doctrina de incuria. Véanse: Caro v. Cardona, 158 D.P.R. 592 (2003); Asoc. Vec. Altamesa Este v. Mun. San Juan, 140 D.P.R. 24 (1996); Rivera v. Depto. de Servicios Sociales, 132 D.P.R. 240 (1992); Aponte v. Srio. de Hacienda, E.L.A., 125 D.P.R. 610 (1990).
Mediante la antes mencionada doctrina de incuria se impide a una parte instar un recurso cuando por su dejadez o negligencia, en conjunto con el transcurso del tiempo y otras circunstancias pertinentes, se causa perjuicio a la otra. IM Winner, Inc. v. Mun. de Guayanilla, 151 D.P.R. 30 (2000). En cuanto a ello, hemos reiterado que no basta el mero transcurso del tiempo para impedir el ejercicio de la causa de acción, sino que se deben evaluar otras circunstancias antes de desestimar el recurso instado, tales como: (1) la justificación, si alguna, de la demora', (2) el perjuicio que esta última acarrea, y (3) el efecto sobre intereses privados o públicos involucrados. Id.; Pérez, Pellot v. J.A.S.A.P., 139 D.P.R. 588 (1995).
En resumidas cuentas, los casos se deben examinar según los hechos y las circunstancias particulares, considerando, además, que
“[s]obre todo[,] es preciso tener en cuenta los méritos y demás circunstancias del caso específico, ya que la doctrina de incuria sigue vinculada a la idea fundamental de la equidad: se acude a la ‘razón’ y a la ‘conciencia’ para encontrar soluciones justas, apartándose del rigorismo intransigente de los términos fatales.” (Énfasis suprimido.) Pueblo v. Valentín, 135 D.P.R. 245, 256 (1994).
De una lectura de las advertencias que le hizo la Junta al peticionario en la resolución recurrida se infiere que no fueron del todo claras y podían —como en efecto lo hicieron— causar confusión. Veamos.
*59 Las mencionadas advertencias establecen, en primera instancia, que:
Si la Junta acoge la Solicitud de Reconsideración deberá resolver la misma dentro de los noventa (90) días siguientes a la radicación de dicha solicitud. El término de treinta (30) días para solicitar la Revisión Judicial comenzará a contarse desde la fecha en que se archiva en autos una copia de la notificación de la Resolución de la Junta resolviendo definitivamente la Solicitud de Reconsideración, cuya resolución deberá ser emitida y archivada en autos. (Enfasis suplido.) Apéndice, pág. 475.
Sin embargo, más adelante indican lo siguiente:
Si la Junta dejare de tomar alguna acción con relación a la Solicitud de Reconsideración dentro de los noventa (90) días de haber sido acogida bajo estudio, perderá jurisdicción sobre la misma y el término para solicitar la Revisión Judicial empezará a contarse a partir de la expiración de dicho término de noventa (90) días, salvo que la Junta, por justa causa y dentro de esos noventa (90) días prorrogue el término para resolver por un período que no excederá de treinta (30) días adicionales. (Énfasis suplido.) Apéndice, pág. 475.
Como se puede apreciar, dicha advertencia resulta contradictoria al expresar, por un lado, que el término de noventa días que tiene la Junta para resolver una moción de reconsideración oportunamente presentada y acogida comenzará su decurso con su presentación y, por el otro, indicar que la Junta perderá jurisdicción para atender la moción de reconsideración transcurridos los noventa días de haber sido acogida para estudio.
Ante dicha incongruencia —la cual es claramente contraria a la L.P.A.U. y al Reglamento de Procedimientos Adjudicativos de la Junta— no nos queda otra alternativa que resolver que las advertencias incluidas en la resolución emitida por la Junta en el presente caso fueron defectuosas y que, por lo tanto, no activaron el término para recurrir en alzada al Tribunal de Apelaciones. Como consecuencia de ello, y según expresamos anteriormente, *60 la tardanza en presentar el recurso ante el foro apelativo intermedio se debe analizar conforme la doctrina de incuria.
De un análisis cuidadoso del expediente ante nuestra consideración se desprende que el recurrido Maldonado actuó conforme a uno de los supuestos incluidos en la advertencia que se incluyó en la resolución que le fue notificada. Asimismo, éste no se cruzó de brazos ni mostró dejadez o negligencia al presentar el recurso de revisión administrativa ante el Tribunal de Apelaciones quince días después de vencido el término que disponen, tanto la L.P.A.U. como el Reglamento de Procedimientos Adjudicativos de la Junta. Finalmente, resulta pertinente destacar que la tardanza del peticionario no fue excesiva y que la Junta no ha alegado perjuicio alguno por ella o para algún interés público o privado que amerite desestimar el caso. Por el contrario, consideramos que el presente caso contiene controversias de alto interés público, las cuales ameritan que se atiendan en los méritos.
En vista de lo antes expuesto, resolvemos que con relación al recurso presentado por el recurrido Maldonado ante el Tribunal de Apelaciones, el aludido foro tenía jurisdicción para atenderlo.
II
 Como es sabido, la Constitución del Estado Libre Asociado de Puerto Rico establece que “[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad”. Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 421. Véanse, además: Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908 (1998); Paoli Méndez v. Rodríguez, 138 D.P.R. 449 (1995).
Conforme dicho mandato constitucional, en el *61 pasado hemos expresado que “ha sido política pública del Gobierno del Estado Libre Asociado de Puerto Rico dirigir el proceso de planificación de nuestra isla hacia un desarrollo integral sostenible asegurando el juicioso uso de las tierras y fomentando la conservación de los recursos naturales para el disfrute y beneficio de todos”. A.R.Pe. v. Rivera, 159 D.P.R. 429 (2003), citando a Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico, 23 R.P.R. sec. 650.821 et seq.
Siguiendo la política pública antes mencionada, la Asamblea Legislativa aprobó la Ley sobre Política Pública Ambiental, Ley Núm. 416 de 22 de septiembre de 2004 (12 L.P.R.A. see. 8001 et seq.), la cual derogó la anterior Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970. Entre los fines que tuvo la Legislatura para aprobar la mencionada ley están, entre otros, los siguientes: (1) establecer una política pública que estimule una deseable y conveniente armonía entre el hombre y su medio ambiente; (2) fomentar los esfuerzos que impedirían o eliminarían daños al ambiente y la biosfera, y estimular la salud y el bienestar del hombre; (3) enriquecer la comprensión de los sistemas ecológicos y fuentes naturales importantes para Puerto Rico.(5)
La Ley Núm. 416, ante —así como su predecesora, la Ley Núm. 9 antes mencionada— dispone, a su vez, en su Art. 4 (12 L.P.R.A. sec. 8001a), que todos los departamentos, las agencias, los municipios, las corporaciones e instrumentalidades públicas del Estado Libre Asociado de Puerto Rico y sus subdivisiones políticas deberán, al máximo grado posible, interpretar, aplicar y administrar todas las leyes y los cuerpos reglamentarios vigentes, y los que en el futuro se aprueben en estricta conformidad con la política pública enunciada en dicha ley.
*62 Asimismo, la Asamblea Legislativa aprobó la Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 de junio de 1975 (23 L.P.R.A. see. 62 et seq.), con el propósito general de
... guiar el desarrollo integral de Puerto Rico de modo coordinado, adecuado, económico, el cual, de acuerdo con las actuales y futuras necesidades sociales y los recursos humanos, ambientales, físicos y económicos, hubiere de fomentar en la mejor forma la salud, la seguridad, el orden, la convivencia, la prosperidad, la defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros habitantes, y aquella eficiencia, economía y bienestar social en el proceso de desarrollo, en la distribución de población, en el uso de las tierras y otros recursos naturales, y en las mejoras públicas que tiendan a crear condiciones favorables para que la sociedad pueda desarrollarse integralmente. Art. 4 de la Ley Núm. 75, ante, 23 L.P.R.A. sec. 62c. Véase Hernández, Álvarez v. Centro Unido, 168 D.P.R. 592 (2006).
Entre las facultades que la Legislatura otorgó a la Junta para que pudiera lograr los propósitos propuestos están adoptar y aprobar los reglamentos que autoriza la ley, el Reglamento de Zonificación y el Reglamento de Lotificación, y cualesquiera otros necesarios o que le autorice promulgar cualquier otra ley. 23 L.P.R.A. sec. 62j(4).
Por otro lado, y en lo relativo a la zona cárstica de Puerto Rico, el 21 de agosto de 1999 se aprobó la Ley para la Protección y Conservación de la Fisiografía Cárstica de Puerto Rico.(6) En esta ley se expresó que “es política pública del Estado Libre Asociado de Puerto Rico proteger, conservar y manejar para beneficio de ésta y futuras generaciones la fisiografía cárs[t]ica de Puerto Rico”. Art. 2 de la Ley Núm. 292, ante, 1999 (Parte 2) Leyes de Puerto Rico 1272, 1275. De igual forma, en la mencionada ley se establece:
El Secretario del Departamento de Recursos Naturales y Ambientales ordenará a los Negociados de Geología, Recursos *63 de Agua, Programa de Zona Costanera, Patrimonio Natural y al Negociado de Pesca y Vida Silvestre que lleven a cabo un estudio que defina las áreas que, debido a su importancia y función geológica, hidrológica y ecosistémica, no puedan ser utilizados bajo ningún concepto para la extracción de materiales de la corteza terrestre con propósitos comerciales, ni para explotaciones comerciales. Dicho estudio ofrecerá alternativas para que las actividades antes señaladas puedan llevarse a cabo bajo condiciones apropiadas en otras áreas de la zona cárstica. Las recomendaciones de este estudio se incorporarán en el Reglamento para la Extracción de Materiales de la Corteza Terrestre y en los reglamentos de la Junta de Planificación para zonificar■ aquellas áreas de la zona cárstica que deban conservarse. (Enfasis suplido.) 12 L.P.R.A. see. 1153.
Conforme a la antes mencionada ley, el 28 de octubre de 2000 se aprobó el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero y el Mapa de Zonificación de la Cuenca Hidrográfica de la Laguna Tortuguero, el cual derogó el Reglamento de la Cuenca Hidrográfica de la Laguna Tortuguero de 1978. Dicho Plan y Reglamento establece una zonificación especial para la cuenca hidrográfica de la Laguna Tortuguero, la cuál determina el uso y la intensidad básica de las actividades actuales y propuestas en el área. Además, dispone que todo proyecto presentado ante la Junta y la Administración de Reglamentos y Permisos deberá cumplir con lo allí establecido y con la Ley sobre Política Pública Ambiental. Finalmente, y en lo pertinente, se indica que no se deberán aprobar pozos de inyección y que “no se aprobarán otros proyectos industriales en la Cuenca”.
Como se puede apreciar de lo antes mencionado, en Puerto Rico —por mandato constitucional— existe una clara política pública dirigida a proteger nuestros recursos naturales. Asimismo, se deduce que dicha política se ha establecido, tanto en un sinnúmero de leyes de carácter general como de carácter específico, y que todo organismo adjudicativo tiene el deber ineludible de utilizarla a la *64 hora de tomar decisiones que puedan afectar el medio ambiente.
Por otro lado, no podemos pasar por alto que desde 1979 se han aprobado reglamentos dirigidos a proteger la sensitiva zona cárstica de Puerto Rico. Dicho interés de conservación es tan importante que en 1999 transcendió el área reglamentaria para enmarcarse en una ley independiente, la cual penaliza con multas administrativas a las personas que realicen ciertas actividades en el área sin el permiso del Secretario del Departamento de Recursos Naturales y Ambientales de Puerto Rico.(7)
Expuesta la política pública ambiental en Puerto Rico y el interés gubernamental particular de proteger el área cárstica, nos corresponde atender las controversias específicas que han surgido entre las partes.
A. En su segundo señalamiento de error, la Junta arguye que el foro apelativo intermedio erró al resolver que para analizar el proyecto propuesto la Junta no podía utilizar el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero, aprobado días después de haberse presentado la consulta de ubicación. Por su parte, el recurrido Maldonado alega que el Tribunal de Apelaciones actuó correctamente al así resolver, ya que utilizar el nuevo reglamento —el cual contiene una prohibición de aprobar nuevos proyectos industriales en la cuenca y de permitir pozos de inyección— para analizar su solicitud implicaría la aplicación retroactiva de un reglamento inexistente a la fecha de la presentación de la misma.
Evaluadas dichas alegaciones, consideramos que la controversia principal que surgió entre las partes se puede resumir de la manera siguiente: Si un Reglamento de Zonificación aprobado con posterioridad a la presentación de *65 una solicitud de consulta de ubicación se puede utilizar como fundamento para denegar la consulta. Veamos.
La controversia antes expresada no ha sido atendida ni resuelta anteriormente por este Tribunal. En vista de ello —y con fines meramente ilustrativos— examinamos la jurisprudencia norteamericana sobre la materia y los comentarios al respecto de diversos tratadistas. El mencionado análisis revela que en la mayoría de los estados de la Nación Americana, la presentación de una solicitud de un permiso antes de entrar en vigor una nueva reglamentación de zonificación, no concede el derecho a obtenerlo para algún uso que prohíba la nueva ordenanza.(8)
Varias jurisdicciones han requerido, como condición a la aplicación de la referida regla general, que la nueva regulación ya esté en proceso de aprobación (“pending”) al solicitarse el permiso en controversia. (Traducción nuestra.) Urey v. Zoning Hearing Bd. of Hermitage, 806 A.2d 502 (2002).
En cuanto al concepto “legally pending”, se ha resuelto que un nuevo reglamento se considerará “pendiente de aprobación” cuando el cuerpo rector ha decidido revisar un esquema de zonificación en particular y ha iniciado un procedimiento de reglamentación, anunciando a la ciudadanía sus intenciones de celebrar vistas públicas sobre el mismo. Sherman v. Reavis, 257 S.E.2d 735, 737 (1979);(9) Continental S.E. Group v. City of Folly Beach, 348 S.E.2d 837 (1986).
En resumidas cuentas, la doctrina antes expuesta —conocida en las jurisdicción norteamericana como “the pending ordinance doctrine”— permite que un permiso de *66 construcción se deniegue utilizando como fundamento un reglamento aprobado posteriormente pero que estuviera en proceso formal de aprobación —pending— antes de la presentación de la petición. A su vez, se considera un reglamento en proceso de aprobación aquel que haya comenzado a evaluarse, ya sea mediante la publicación de avisos o la celebración de vistas públicas, antes de la fecha de presentación de la solicitud. Lo primordial para determinar si la reglamentación está pendiente es evaluar si el proceso de su aprobación ya había comenzado oficialmente y si se habían hecho gestiones para informar al pueblo sobre el particular.
Un fundamento adicional en apoyo a la aplicación de la doctrina de la reglamentación pendiente —pending ordinance doctrine— en nuestra jurisdicción es que aquí, al igual que en los estados en donde mayoritariamente se ha adoptado la doctrina, una solicitud de permiso no concede un derecho adquirido para su aprobación. En cuanto a ello, hemos expresado que en materia de permisos de construcción la persona adquiere un derecho —que no lo puede derogar una ley posterior— una vez se haya expedido y ésta actúe conforme el mismo e incurra en gastos sustanciales. Phi Delta Pi v. Junta Planificación, 76 D.P.R. 585, 591 (1954), citando a Yokley, Zoning Law and Practice, 2da ed., pág. 234.
Así, pues, un solicitante no adquiere un derecho a obtener una consulta de ubicación por el mero hecho de presentar su solicitud en un momento en el que la reglamentación vigente la permite. Por ende, si a la fecha de la presentación de la solicitud existe una nueva reglamentación pendiente de aprobación, y ésta se aprueba antes de que la solicitud se resuelva, dicha reglamentación se puede utilizar a la hora de conceder o denegar la solicitud de consulta. Claro está, distinto es el caso en el que la consulta de ubicación se haya concedido antes de entrar en vigor la nueva reglamentación, ya que en ese momento el *67 solicitante ya tiene un derecho adquirido del cual no puede ser despojado sin un debido proceso de ley.
Contamos con una opinión que el Secretario de Justicia de Puerto Rico emitió en 1970 sobre una controversia similar a la hoy ante nuestra consideración, en la cual se “adoptó” la misma posición que hoy mayoritariamente prevalece en la jurisdicción norteamericana sobre este punto.(10) Aun cuando las opiniones emitidas por el Secretario de Justicia de Puerto Rico no obligan a los tribunales,(11) la señalamos por el valor persuasivo que pueda tener. Es de notar que en dicha ocasión, el mencionado funcionario determinó que un Oficial de Permisos de la Junta podía utilizar el Reglamento Núm. 4 de 7 de febrero de 1970 para evaluar las solicitudes de permisos que estaban sin resolver al entrar el mismo en vigor.(12)
En vista de todo lo anteriormente expuesto, y del alto interés público que tiene la protección del medio ambiente y de los recursos naturales en nuestra jurisdicción, resolvemos que la normativa antes mencionada es una que debe ser adoptada en nuestra jurisdicción. Al respecto, citamos las expresiones siguientes en Sherman v. Reavis, ante, pág. 737:
It would be utterly illogical to hold that, after a zoning commission had prepared a comprehensive zoning ordinance or an amendment thereto, which was on file and open to public inspection and upon which public hearings had been held, and *68 while the ordinance was under consideration, any person could by merely filing an application compel the municipality to issue a permit which would allow him to establish a use which he either knew or could have known would be forbidden by the proposed ordinance, and by so doing nullify the entire work of the municipality in endeavoring to carry out the purpose for which the zoning law was enacted. (Énfasis suplido.)
Una vez resuelto lo anterior, corresponde determinar si el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 estaba pendiente de aprobación cuando se presentó la consulta de ubicación en controversia. De esto ser así, debemos resolver si, según las disposiciones incluidas en el mencionado Plan y Reglamento, la Junta actuó correctamente al denegar la consulta de ubicación solicitada. Veamos.
B. De un análisis del expediente ante nuestra consideración se deduce que la consulta de ubicación en controversia la presentó el recurrido el 5 de septiembre de 2000 y que el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero lo firmó el entonces Gobernador de Puerto Rico, Hon. Pedro Rosselló González, el 28 de octubre de 2000, o sea que el referido reglamento entró en vigor cuarenta y tres días después de la presentación de la consulta de ubicación en controversia. Asimismo, del propio documento inferimos que el 23 de noviembre de 1999 —casi diez meses antes de la presentación de la consulta de ubicación— la Junta celebró unas vistas públicas para que los organismos gubernamentales, los propietarios de terrenos y otros grupos interesados participaran y comentaran el reglamento.
Por lo anterior, concluimos que el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 era un documento “pendiente de aprobación” cuando el recurrido Maldonado presentó la consulta de ubicación. Resulta obvio que la Junta tenía intenciones de preparar ese plan y reglamento, y que *69 había comenzado el proceso de aprobación mucho antes de que el recurrido solicitara permiso para establecer un parque industrial pesado en los terrenos ubicados en la cuenca hidrográfica de la Laguna Tortuguero. Tan es así que el 23 de noviembre de 1999 la Junta presentó el referido documento en una vista pública a la cual asistieron organismos gubernamentales, propietarios de terrenos y otras personas con interés.
Según lo anterior, consideramos que de acuerdo con la doctrina “pendiente de aprobación” antes mencionada —la cual hoy adoptamos en nuestra jurisdicción— la Junta podía utilizar el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 para evaluar la consulta de ubicación que solicitó el recurrido. Así, pues, corresponde determinar si procedía denegarla según las normas establecidas en dicho documento.
C. Ya mencionamos que el recurrido Maldonado solicitó una consulta de ubicación para construir un parque industrial pesado en un terreno de aproximadamente cuarenta y cinco cuerdas, más tres o cuatro cuerdas de una finca a segregarse, sita en el barrio Cotto Norte de Manatí, y que dicho terreno ubica en los predios protegidos tanto por el antiguo como por el nuevo Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortugero.
El referido Reglamento clasifica los terrenos donde se propone la ubicación del proyecto solicitado como LT-A1 y LT-B1 (esencialmente la misma categoría que el anterior reglamento). Específicamente, para los terrenos ubicados en el Distrito LT-A1, dicho reglamento establece los usos siguientes: (1) agrícola, tales como siembra de productos, siempre y cuando se utilicen fertilizantes y plaguicidas orgánicos que no contaminen; (2) usos y edificios accesorios estrechamente relacionados o complementarios a los cultivos, que es el uso principal de la finca; (3) vivienda para una familia. Por otro lado, para los terrenos ubicados en el *70 Distrito LT-B1 se disponen los usos siguientes: (1) agrícola; (2) edificios de usos accesorios a los usos principales; (3) venta de productos cosechados en la finca, incluso la madera; (4) talleres de artesanía; (5) casa para una o dos familias con ciertos requisitos.
De igual forma, debemos destacar que el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 dispone, entre las estrategias para los usos industriales, que “no se aprobarán otros proyectos industriales en la Cuenca”. Además, establece que para proteger los sistemas naturales —como los sumideros— se prohibirá “la construcción de pozos de inyección que se usan para disponer de las aguas pluviales, [ya que] éstos alteran el equilibrio hidrogeológico subterráneo”.
Según lo anterior, resulta meridianamente claro que el proyecto que propuso el recurrido no está entre los usos permitidos por el Plan y Reglamento Especial antes mencionado. Peor aún, la aprobación de parques industriales, como el que el recurrido pretende establecer, está ex-presamente prohibida en dicho documento. Así lo dejó establecido la Junta en su resolución y así lo observamos al analizar el Reglamento. Además, de la resolución de la Junta se deduce que el proyecto solicitado propone que se utilicen dos pozos de inyección (Clase V y Tipo B5) para las aguas de escorrentías, lo que también prohíbe expresamente el aludido documento.
Además de los anteriores fundamentos, la Junta también resolvió que el proyecto propuesto atenta contra varios objetivos y políticas públicas del Plan de Usos de Terrenos de Puerto Rico.(13) No los discutiremos, ya que *71 consideramos que con los fundamentos iniciales —relacionados con la prohibición de aprobar nuevos parques industriales en el área y nuevos pozos de inyección— era suficiente para denegar el proyecto solicitado.
Antes de finalizar, debemos reiterar que los tribunales debemos deferencia a las determinaciones de las agencias administrativas, máxime cuando en la controversia planteada se incluyen asuntos relacionados con sus áreas de especialización o pericia. También hemos resuelto que dicha deferencia solamente cederá cuando la determinación no está basada en evidencia sustancial, cuando se haya errado en la aplicación de la ley o cuando ha mediado una actuación irrazonable o ilegal;(14) situaciones que, como vimos, no se dan en el presente caso.
Asimismo, debemos recordar que la zona cárstica contiene uno de los mayores acuíferos freáticos de Puerto Rico y es de incomparable valor escénico, natural, cultural e histórico, lo que la hace un área con un gran potencial turístico, ecológico y de investigación científica.(15) Por esto consideramos que le aplica en todo su vigor la política pública del Gobierno de Puerto Rico diri *72 gida a lograr un desarrollo integral sostenible que asegure el uso juicioso de las tierras y fomente la conservación de los recursos naturales para el disfrute y beneficio de todos. Véase A.R.Pe. v. Rivera, ante.

Por los fundamentos antes expresados, resolvemos que se podía aplicar el Plan y Reglamento Especial para la Cuenca Hidrográfica de la Laguna Tortuguero de 28 de octubre de 2000 a la consulta de ubicación que presentó el recurrido y que, según las disposiciones del mismo procedía que se denegara.

(16)

 En consecuencia, erró el Tribunal de Apelaciones al ordenar la devolución del caso a la Junta para celebrar procedimientos adicionales.

En mérito de lo antes expuesto, procede revocar la Sentencia emitida por el Tribunal de Apelaciones el 29 de agosto de 2003 y, en consecuencia, restablecer la Resolución de la Junta de Planificación emitida el 17 de enero de 2002, la cual denegó la consulta de ubicación Número 2000-08-0804-JPU.

Se dictará sentencia de conformidad.

La Jueza Asociada Señora Fiol Matta emitió una opinión concurrente y disidente, a la cuál se unió la Juez Asociada Señora Rodríguez Rodríguez. El Juez Asociado Señor Fuster Berlingeri no interviene.

 Dicha solicitud recibió el número 2000-08-0804-JPU.

 Los fundamentos ofrecidos por el Instituto Ambiental COTICAM de Puerto Rico (COTICAM) para su oposición se basaron en consideraciones ambientales en cuanto a la ubicación del proyecto propuesto en la Cuenca Hidrográfica de la Laguna Tortuguero, las malas prácticas en el manejo y el uso de pesticidas en el sector, la obstrucción de las aguas pluviales y la existencia de más de diez pozos cerrados en el área por contaminación.

 En lo pertinente, la See. 9 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación dispone lo siguiente:
“En la [R] esolución, se advertirá a la parte afectada de su derecho a solicitar una reconsideración de la determinación de la Junta, dentro del término de veinte (20) días a partir de la fecha del archivo en autos de la notificación.
“La Junta, dentro de los quince (15) días de haberse presentado dicha moción deberá considerarla. Si la rechazare de plano o no actuare dentro de los quince (15) días, el término para solicitar revisión, comenzará a correr nuevamente, desde que se notifique dicha denegatoria o desde que expiren esos quince (15) días, según sea [el] caso. Si se tomare alguna determinación en su consideración, el término de treinta (30) días para solicitar Revisión Judicial, comenzará a contarse, desde la fecha en que se archiva en autos una copia de la notificación de la Resolución de la Junta, resolviendo definitivamente, la solicitud de reconsideración, cuya resolución, deberá ser emitida y archivada en autos dentro de los noventa (90) días siguientes [a la] radicación de dicha solicitud. Si la Junta, dejare de tomar alguna acción con relación a la solicitud de reconsideración dentro de los noventa (90) días de haber sido radicada una solicitud acogida para resolución, perderá jurisdicción sobre la misma y él término para solicitar Revisión Judicial, comenzará a contarse, a partir de la expiración de dicho término de noventa (90) días (Enfasis suplido.) Reglamento Núm. 6031 de 13 de octubre de 1999, págs. 39-40.

 Salvo que la Junta de Planificación, por justa causa y oportunamente, ex-tienda el término.

 Es menester desatacar que los fines que tuvo la Legislatura para aprobar ambas leyes son idénticos.

 Ley Núm. 292 de 21 de agosto de 1999 (12 L.P.R.A. sec. 1151 et seq.).

 Entre las actividades prohibidas está la extracción, excavación y remoción de roca caliza con propósitos comerciales o de nivelación de terrenos. 12 L.P.R.A. sec. 1152.

 “Ordinarily an application for a permit made before a zoning ordinance becomes effective gives in itself no right to a use excluded by the ordinance.” 8 McQuilin, The Law of Municipal Corporations Sec. 25.155, pág. 567 (3ra ed. rev. 2000). Véanse, además: Coral Springs Street Systems v. City of Sunrise, 371 F.3d 1320 (11mo Cir. 2004); County of Santa Fe v. Public Service Co. of N.M., 311 F.3d 1031 (10mo Cir. 2002); Stratos v. Town of Ravenel, 376 S.E.2d 783 (S.C. App. 1989).

 “An ordinance is legally pending when the governing body has resolved to consider a particular scheme of rezoning and has advertised to the public its intention to hold public hearings on the rezoning.”

 Op. Sec. Just. Núm. 1970-30.

 Véase In re Secretario de Justicia, 118 D.P.R. 827, 855 (1987).

 Son pertinentes a nuestra controversia las expresiones del Secretario de Justicia en el escolio 2 de la mencionada opinión, en la cual cita a 101 C. J.S., Zoning, 221:
“According to some authorities, where, after the making of an application for a permit but before a decision thereon, the regulations applicable to the subject matter of the permit sought are changed, the application is governed by the regulations as changed, and a municipality may properly refuse a building permit for a land use repugnant to a pending and later-enacted zoning ordinance even though the application for the permit is made when the intended use conforms to existing regulations, provided that no permit has been issued and relied on in good faith to the substantial detriment of the holder of the permit.” (Énfasis suprimido.)

 Específicamente utilizó la Política Pública 30.02 y 31.00 las cuales obligan a lo siguiente:
“Política Pública 30.02: Controlar las actividades de desarrollo de terrenos, la construcción y las lotificaciones que pudieran afectar adversamente la calidad de las aguas, en particular en las áreas de recarga de los acuíferos y en las cuencas inmediatas de los lagos y embalses, incluyendo entre otros, actividades tales como la *71 pavimentación excesiva que aumenta el caudal de aguas de escorrentía, el uso indiscriminado de fertilizantes y plaguicidas que desmerecen la calidad de nuestros cuerpos de agua, el desmonte, la remoción de la capa vegetal y los movimientos de tierra que provocan la erosión y sedimentación.
“Política Pública 31.00: Propiciar la protección de áreas con suelos kársticos que por las formaciones calcáreas y por sus características hidrogeológicas proveen beneficios para los acuíferos, protegen las aguas superficiales y mantienen la integridad ecológica de los sistemas naturales.
“Estimular la conservación de mogotes de naturales kárstica.
“Mantener la integridad natural de los sistemas de drenaje en suelos kársticos, desestimulando las alteraciones en las áreas de carga y recarga de los cuerpos de aguas subterráneas y de las cuencas hidrográficas de aguas superficiales.
“Evitar las hidromodifieaciones en áreas kársticas de vital importancia.
“Evitar las alteraciones del equilibrio ecológico e hidrogeológico en aquellas áreas kársticas donde los estudios edafológicos y geológicos recomiendan la protección de dichas funciones.”

 Otero v. Toyota, 163 D.P.R. 716 (2005); Reyes Salcedo v. Policía de P.R., 143 D.P.R. 85, 94 (1997); Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265 (1987).

 Véase Orden Ejecutiva del Gobernador aprobando el Plan y Reglamento Especial para la Cuenca hidrográfica de la Laguna Tortuguero, 2000-OE-56.

 En vista del resultado al que hemos llegado, resulta innecesario discutir los restantes señalamientos de error de la peticionaria.